UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERRI JEAN PARKS,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>PORT OF OAKLAND,<br><br>　　　　　Defendant. | Case No. 16-cv-04061-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 68 |

Pending before the Court is Defendant's motion for summary judgment. Dkt. No. 68. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

**I.　PROCEDURAL HISTORY**

On July 19, 2016, pro se Plaintiff Sherri Jean Parks filed this employment discrimination action against Defendant[1] Port of Oakland ("the Port"). Dkt. No. 1. Plaintiff has been employed as a plumber for the Port of Oakland since 2001. Plaintiff asserts violations of (1) Title VII; (2) the Americans with Disabilities Act; and (3) the Equal Pay Act and Fair Pay Act. Dkt. No. 31 ("SAC"). Defendants filed the current motion for summary judgment on July 3, 2018.

**II.　BACKGROUND**

　**A.　Title VII, Equal Pay Act, and Fair Pay Act Claims**

Defendant manages backflow devices for the Port and other entities. Dkt. No. 75 ¶ 6.[2] A backflow device is "a valve or series of valves . . . configured to prevent the undesirable reversal of flow of water mixtures . . . getting into the distribution pipes of the potable supply of water." *Id*. Defendant contends that plumbers at the Port are responsible for testing and repairing

---

[1] Although Plaintiff initially named both the Port of Oakland and the City of Oakland as defendants in this action, the Court dismissed all claims against the City of Oakland and only the Port remains. *See* Dkt. No. 29.
[2] The facts listed in this section are undisputed unless otherwise noted.

backflow devices as a part of their regular duties. *Id.* Both parties agree that the task of "administering" the backflow device program is outside of the regular duties for a plumber. *Id.* ¶ 7.

Article 13.J of the Memorandum of Understanding ("MOU") between the Port and Service Employees International Union, Local 1021 ("SEIU") provides that "[w]hen an employee performs duties that are clearly above and outside of the duties in the employee's job specification, the employee shall be paid an additional 6% of the regular pay for his/her own classification." Dkt. No. 74 ("Mitchell Decl."), Ex. 1 ("MOU") at 36.

Plaintiff, a plumber for the Port, contends that she performed backflow-related duties that warranted a 6% pay increase and was not compensated, while other, similarly situated male plumbers received the pay increase for similar work. SAC ¶¶ 9–20; Dkt. No. 87-1 at 4.

### B. ADA Claims

In April of 2013, Plaintiff was suffering from numerous injuries, and was scheduled for surgery to repair her rotator cuff on or around July 1, 2013. Dkt. No. 79 ("Singh Decl.") ¶¶ 3, 5. Prior to that surgery, on April 29, 2013, Plaintiff's physician issued work restrictions to Defendant that required Plaintiff to take off one shift per week. Singh Decl. ¶ 4, Ex. 1. Defendant evaluated the request and found that eliminating one shift per week would be impossible, and on May 8, 2013 Plaintiff was put on paid leave until her July surgery. Dkt. No. 77 ¶ 7; Singh Decl. ¶ 5. At some point between July 1 and September 23, Defendant placed Ms. Parks on "unpaid status." Dkt. No. 87-2, Ex 7 at 6; Singh Decl. ¶ 5. In early October, Defendant received a report from Plaintiff's doctor that Plaintiff would be unable to work for at least the next four weeks due to pain in her hands. Singh Decl. ¶ 7, Ex. 4. Plaintiff underwent surgery on her wrist at the end of October, 2013. Singh Decl. ¶ 7, Ex. 4 at 6. Following that wrist surgery, on or around December 3, 2013, Plaintiff's physicians communicated to Defendant that Plaintiff could return to work with certain limitations, including being unable to lift, push, or pull items over a certain weight. Singh Decl. ¶¶ 8–9, Exs. 5, 6. Defendant contacted Plaintiff to begin the process of interactive disability accommodation in early December of 2013. Dkt. No. 76 ¶ 4.

The parties held an interactive process meeting on January 17, 2014 during which

2

Defendant concluded that Plaintiff was unable to perform the essential functions of her employment with or without accommodations. Dkt. No. 76 ¶ 8, Ex. 10; Dkt. No. 75 ¶ 9. On February 13, 2014, Plaintiff's physician informed Defendant that her work restrictions were modified. Dkt. No. 76 ¶ 10, Ex. 12; Singh Decl. ¶ 11, Ex. 8. The Port subsequently determined that Plaintiff's new restrictions, which included a requirement that Plaintiff take off one shift per week, could be accommodated, and Plaintiff returned to work on February 14, 2014. Dkt. No. 75 ¶ 10.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence

1  supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

## IV. DISCUSSION

### A. Arbitration Pursuant to MOU

Defendant contends that Plaintiff's first and second claims, which allege sex discrimination under Title VII and the Equal Pay Act and Fair Pay Act, are properly subject to arbitration because they implicate the provisions of the MOU. Dkt. No. 68 at 13–16.

#### i. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (noting federal policy favoring arbitration). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . .

4

. in favor of arbitration." *Id.*

Arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In analyzing whether an arbitration agreement is valid and enforceable, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996). In interpreting the validity and scope of an arbitration agreement, the courts apply state law principles of contract formation and interpretation. *See Wolsey, Ltd. v. Foodmaker, Inc.,* 144 F.3d 1205, 1210 (9th Cir. 1998) (citation omitted).

When considering a motion to compel arbitration, the court is limited to determining (1) whether a valid arbitration agreement exists, and, if so (2) whether the arbitration agreement encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.,* 533 F.3d 1114, 1119 (9th Cir. 2008). If these conditions are satisfied, the court must compel arbitration. 9 U.S.C. § 4; *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration.").

ii. **Analysis**

Article 13.J of the MOU provides that "[w]hen an employee performs duties that are clearly above and outside of the duties in the employee's job specification, the employee shall be paid an additional 6% of the regular pay for his/her own classification." MOU at 36.

Article 5 of the MOU outlines the procedure for grievances, which are defined as "dispute[s] which involve[] the interpretation or application of this Agreement, the applicable personnel rules of the Port and/or disciplinary action taken." MOU at 12. The MOU then describes an escalating administrative grievance process in which an aggrieved employee: (1) "may present the grievance orally to the immediate supervisor"; (2) "may submit the grievance in writing to the immediate supervisor"; (3) "may . . . submit the written grievance to the department manager to whom the supervisor immediately reports"; (4) "may . . . submit the written grievance to the Port Employee Appeals Officer"; and, (5) "[s]houd the grievance remain unresolved . . .

5

either party may . . . submit such grievance to an impartial arbitrator." MOU at 12–13.

By the language of the MOU, Plaintiff is compelled to arbitrate unresolved grievances that involve the "interpretation or application" of the MOU. *See Collins v. Burlington N. R. Co.*, 867 F.2d 542, 544 (9th Cir. 1989) (permissive language in an arbitration provision should be construed as mandatory). Title VII claims can be subject to arbitration. *Mago v. Shearson Lehman Hutton Inc.*, 956 F.2d 932, 935 (9th Cir. 1992) (holding that Title VII claims are not per se unarbitrable).

Plaintiff's first two claims allege sex discrimination based on Defendant's failure to offer Plaintiff a 6% pay increase for her work as a backflow assembly tester, while offering that same increase to "similarly situated males." SAC ¶¶ 12, 20. Plaintiff's claims therefore require a comparison between Defendant's application of Article 13.J of the MOU to Plaintiff and Defendant's application of that same section to male plumbers. Because Plaintiff's first two claims involve the application of the MOU, they are encompassed within the MOU's arbitration provision and must be decided by an arbitrator in the first instance.

### B. Disability Discrimination (Claim Three)

Defendant contends that Plaintiff's third claim for disability discrimination fails because (1) Plaintiff was not "disabled" within the meaning of the ADA, and (2) there is no dispute of material fact that Plaintiff did not suffer an "adverse employment action" as a result of her alleged disability. Dkt. No. 68 at 19–21. "[T]o establish a prima facie case of discrimination under the ADA [Plaintiff] must show that she: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of her disability." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8).

#### i. Background and Scope

Plaintiff's claim alleges that Defendant "refused to allow [Ms. Parks] to continue working until [her] scheduled surgery on or around the first part of May 2013." SAC ¶ 21. Making all inferences in Plaintiff's favor, the period encompassed by this claim begins May 8, 2013, when Ms. Parks was initially placed on fully paid leave, Singh Decl. ¶ 5, and continues until the end of

October, 2013 when Ms. Parks underwent wrist surgery, *Id.*, Ex. 4 at 6.

On July 30 or 31, 2013, Defendant received a report from Plaintiff's doctor that Plaintiff was unable to return to work. Singh Decl. ¶ 6, Ex. 3. In August, 2013, Plaintiff claims that she was moved from paid leave to unpaid leave. Dkt. No. 87-1 at 8; Dkt. No. 87-2, Ex. 7 at 6 (email chain confirming that Ms. Parks was on "unpaid status" by at least September 23, 2013). On October 1, 2013, Defendant received a second report from one of Plaintiff's doctors indicating that Plaintiff's work status was "Temporarily Totally Disabled" for at least four weeks. Sing Decl. ¶ 7, Ex. 4.

### ii. **Disability**

An individual has a disability under the ADA if that person has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C.A. § 12102(1)(A); 29 C.F.R. § 1630.2(g)(1)(i). "[W]hether a person is disabled under the ADA is an individualized inquiry." *Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003) (citation omitted).

Here, Plaintiff testified that she suffered from carpal tunnel, a torn knee ligament, torn rotator cuffs, and a herniated disk in her neck. Dkt. No. 72, Ex. 1 ("Parks Depo.") at 153:20–154:3. Defendant points to Plaintiff's other testimony stating that she does not recall her work limitations resulting from her injuries, *id.* at 169:5–13, 171:25–172:3, 173:4–8, that she was not prevented from working, *id.* at 170:15–171:18, and that that there were no aspects of her job that Plaintiff was unable to perform due to her "head injury," *id.* at 175:15–19. This testimony does not resolve the factual dispute as to whether Plaintiff had a disability that substantially limited one or more major life activities during the time in question, especially in light of Defendant's knowledge of Plaintiff's injury-related work restrictions as early as 2011. *See* Singh Decl. ¶ 3. Therefore, making all inferences in Plaintiff's favor, the Court cannot find as a matter of law that Plaintiff did not have a disability under the ADA.

### iii. **Adverse Employment Action**

An "adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of ... employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th

7

Cir. 2008) (brackets in original).

Plaintiff alleges that she was placed on unpaid leave in August of 2013 as a result of her alleged disabilities. Dkt. No. 87-1 at 8. Defendant contends that during this period of unpaid leave, Plaintiff was unable to perform the essential functions of her position, and therefore was not qualified for ADA accommodation. Dkt. No. 89 at 6 (discussing unpaid leave in November); Singh Decl. ¶¶ 7–11. Based on the doctor's reports from the end of July and the beginning of October, Plaintiff was unable to return to work with or without accommodation. Singh Decl. ¶¶ 6–7, Exs. 3, 4. As a result, Plaintiff was not a "qualified individual" during the time period that she alleges having suffered an adverse employment action. The Court therefore finds that, even making all inferences in Plaintiff's favor, Plaintiff's ADA claim for the period between May and October 2013 fails as a matter of law.

### C. Failure to Accommodate in May 2013 (Claim Four)

Defendant contends that Plaintiff's claim that the Port failed to make "reasonable accommodations" for Plaintiff's alleged disability fails as a matter of law because Plaintiff communicated to the Port that she had no limitations or difficulties performing the essential functions of her job. Dkt. No. 68 at 21–22. Defendant cites to *Kocsis v. Multi Care Mgmt., Inc.*, a Sixth Circuit case affirming a summary judgment ruling in favor of the defendant where the plaintiff "never requested any accommodation from the defendant," "testified several times that she was physically capable of performing the [required] duties," and the plaintiff's "doctors reported that she was not limited in her activity and that she, consequently, did not need any accommodations." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882–883 (6th Cir. 1996).

Even if the Court chose to consider *Kocsis* as persuasive authority, viewing the evidence in the light most favorable to Plaintiff, the record here does not meet any of these conditions. Plaintiff's doctors and the Port's own physician informed Defendant of Plaintiff's need for accommodation on multiple occasions before Defendant allowed Plaintiff to resume working. Singh Decl ¶¶ 8–10, Exs. 5, 6, 7; Dkt. No. 76 ¶ 7, Ex. 8. And, as discussed above with respect to Plaintiff's third claim, Plaintiff's statements at deposition do not prove as a matter of law that Plaintiff did not have an ADA-covered disability. *See* Parks Depo. at 169:8–12 (Q: "But around

April of 2013, did you have any particular work limitations?" A: "I'd have to look at the records for that." Q: "As you sit here today, do you recall any?" A: "I don't know.").

### D. Failure to Accommodate in December 2013 and early 2014 (Claim Five)

Defendant contends that there is no dispute of material fact that the Port sufficiently engaged in the interactive process with Plaintiff following her 2013 and 2014 surgeries and accommodated her alleged disabilities when she eventually returned to work. Dkt. No. 68 at 22–24.

Plaintiff alleges that Defendant "unnecessarily delayed initiating the interactive accommodation process" until January of 2014, and denied the reasonable accommodations plaintiff requested until she was allowed to return to work on February 14, 2014. SAC ¶¶ 32–33.

"[O]nce the need for accommodation has been established, there is a mandatory obligation to engage in an informal interactive process to clarify what the individual needs and identify the appropriate accommodation. This interactive process is triggered upon notification of the disability and the desire for accommodation. An employer who fails to engage in such an interactive process in good faith may incur liability if a reasonable accommodation would have been possible." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (internal citations and quotation marks omitted).

Plaintiff had wrist surgery in late October of 2013. Singh Decl., Ex. 4 at 6. On December 4, 2013, Defendant received a status report from Plaintiff's physicians clearing Plaintiff to return to work with certain restrictions. Singh Decl. ¶¶ 8–9, Exs. 5, 6.

Plaintiff contends that, at the January 17, 2014 meeting to discuss accommodations, Defendant did not participate in the interactive process in good faith, and failed to provide Plaintiff with a reasonable accommodation as a result. Dkt. No. 87-1 at 9. Plaintiff, on multiple occasions before the January 17 interactive process meeting, informed Defendant of her disabilities. *See, e.g.,* Dkt. No. 76, Ex. 3 (December, 2013 email thread between Plaintiff and Defendant discussing "medical condition covered by ADA and FEHA" and physician's suggested accommodations). Plaintiff's doctor, as well as the Port physician who examined Plaintiff, confirmed that Plaintiff required accommodations in order to return to work. *Id.*, Exs. 3, 8 (Port physician report). It is

undisputed that Plaintiff suggested several possible accommodations that would allow her to return to work at the January 17 meeting, and that Defendant rejected each of these accommodations. Dkt. No. 75 ¶ 9.

Though the Court takes no position on whether Plaintiff's surviving ADA claims are likely to prevail at trial, when all inferences are made in Plaintiff's favor as required at this stage, issues of material fact remain as to whether Defendant is liable for denying Plaintiff's suggested accommodations. Defendant's evidence that the Port "ultimately could not identify any feasible way" to provide any of Plaintiff's suggested accommodations does not prove as a matter of law that Defendant acted in good faith and that no accommodation was possible. Dkt. No. 75 ¶ 9. Plaintiff's characterization of the denial as the result of less-than-genuine participation on the part of the Port raises an issue of material fact properly subject to jury determination. *See* Dkt. No. 87-1 at 9.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED** as to Claims One, Two, and Three, and **DENIED** as to Plaintiff's remaining claims.

**IT IS SO ORDERED.**

Dated: 9/10/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge

10